[Civ. No. 14144. Second Dist., Div. Three. Nov. 12, 1943.]

FIREMAN'S FUND INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, BONINA VRAGNIZAN et al., Respondents.

Clayton B. Thomas for Petitioner.

Everett A. Corten and Fred G. Goldsworthy for Respondents.

WOOD (Parker), J.—The compensation insurance carrier of the employer of the decedent, Marin Vragnizan, seeks by this petition for review to annul a death benefit award made by the Industrial Accident Commission in favor of the widow and minor children of decedent. The question for decision is: Was the injury which caused the death of Marin Vragnizan an injury arising out of and occurring during the course of his employment?

The decedent was employed as a janitor in a saloon in San Pedro. The employment agreement provided that the decedent should do the janitor work after the saloon was closed at 2 a. m. and before it was opened at 6 a. m., in order that such work would not interfere with the customers; and it provided further that decedent should not have a key to the place, but he should be in the saloon when it was closed in order that he might be locked therein from the time it was closed at 2 a. m. until it was opened at 6 a. m. The owner left the place each day about 11 p. m. and was not present at closing time. Two bartenders, who were in charge of the saloon after the owner left, closed the saloon and locked the janitor therein each night. Decedent had been so employed three weeks preceding the injury, and on occasions during that time, when there was no business, the bartenders closed the saloon one-half hour or an hour earlier than 2 a. m. The decedent usually left his home, which was about 12 blocks from the saloon, about 1 a. m., and arrived at the place each day a few minutes or one-half hour earlier than 2 a. m. in order to get his janitor's equipment ready, and to be there in time to be locked in the building if it should be closed before 2 a. m. On the day of the injury the decedent arrived there about 1:15 a. m. When he entered the place he was carrying an article which appeared to be a pail, and he went immediately to the back storeroom. About five minutes thereafter he came back to the barroom, and in a playful manner "made a couple of passes" at one of the bartenders, and then sat at the bar. About 1:30 a. m. he was killed by a gunshot fired at one of the bartenders.

One Jerkins, who was a Croat, and one of the bartenders,

who was a Serbian, were friends, but they had had arguments on various occasions about the war. About 11 p. m., preceding the injury, Jerkins entered the saloon and began singing "funny" songs in Slavonian. There were a few customers in the place at that time. The duties of the bartender included that of maintaining peace and order, and ejecting disorderly persons from the saloon. The bartender (the Serbian) told Jerkins to quit such singing because people did not enjoy it in wartime. Then Jerkins in a loud voice called the bartender's father and mother vile names. After the bartender told him to quit and that if he did not quit the bartender would throw him out of the saloon, Jerkins reached across the bar and, with his fist, hit the bartender on the forehead. Jerkins then took his (Jerkins') coat off and asked the bartender "to come outside." When they were on the sidewalk in front of the saloon door the bartender knocked Jerkins down twice. After the fight on the sidewalk, Jerkins went back into the saloon and the other bartender ejected him. Jerkins said he was "going to get" the bartender who had knocked him down.

About 1:30 a. m. the bartender who had knocked Jerkins down went outside in front of the saloon for the purpose of "looking around on the street to see if anybody was passing by on account there wasn't any business," and to open the front door which had been shut. As he had his hand on the door and was turning to go back into the saloon a shotgun was fired toward him by Jerkins, who was across the street in an alley, and as a result thereof the bartender was injured and Marin Vragnizan, the janitor, was killed. After the shooting the decedent lay upon the floor of the saloon about 10 feet from the place where the bartender was standing when the gun was fired. Decedent was not connected in any way with any argument between Jerkins and the bartender.

■ The finding of the commission that the injury occurred during the course of decedent's employment is sustained by the evidence. The decedent knew it was the practice on occasions to close the saloon earlier than 2 a. m. In order to comply with the provision of the employment agreement that he should be locked in the saloon, and in order to cooperate with those in charge of closing the place in the event they should decide to close it earlier than 2 a. m., it was necessary that decedent be there during a substantial part of the hour preceding 2 a. m. His arrival at the saloon was

not at such a long time prior to 2 a. m. that it should be concluded that such arrival was remote from, and unrelated to, reasonable and adequate preparation for the actual commencement of the specific janitor work. Apparently, insofar as decedent knew prior to his arrival, he might have been required, in view of the custom of closing early, to proceed immediately with the actual janitor work upon his arrival at 1:15 a. m. In the case of *Judson Mfg. Co.* v. *Industrial Acc. Com.* (1919), 181 Cal. 300 [184 P. 1], it was stated at page 302: "The right to compensation is by no means restricted to those cases where the injury occurs while the employee is actually presently manipulating the tools of his calling. . . . It seems to us, however, that when an employee has arrived at the premises of his employer and is thereon for the purpose of immediately commencing his actual work, he is performing service incidental to his employment." In *Freire* v. *Matson Navigation Co.* (1941), 19 Cal.2d 8 [118 P.2d 809], a janitor, employed by defendant, who regularly reported for duty at 8 a. m., arrived at 7:45 a. m. in a taxicab at a pier where the ship upon which he was to work was moored. As he alighted from the cab he was injured by an automobile operated by defendant's employee. In holding that the injury arose out of and occurred in the course of the janitor's employment, the court said at page 13: "He was obliged to be there on the morning of the accident before 8 o'clock in readiness to go on the pier and thence to his ship at that time." The court said further on the same page: "The fact that the accident happened some minutes before plaintiff was to begin work was immaterial." In *California Cas. Ind. Exch.* v. *Industrial Acc. Com.* (1943), 21 Cal.2d 751 [135 P.2d 158], it was stated at page 754: "The term 'employment' includes not only the doing of the work, but a reasonable margin of time and space necessary to be used in passing to and from the place where the work is to be done. . . . In other words, the employment may begin in point of time before the work is entered upon and in point of space before the place where the work is to be done is reached."

The finding of the commission that the injury arose out of the employment is sustained by the evidence. There was testimony by the bartender, who had been employed there seven years, that the reputation of the saloon was not very good; that the town was pretty rough; that the reputation of the district where the saloon was located was "not

bad," and that the reputation of the district was "a little bit better, but down on the water front it is still worse"; that there were very few fights in the saloon; and that he had to throw the "drunks" out "to protect the other customers." Although Jerkins and the bartender had had arguments about the war prior to the day of the injury, they had had "no mean arguments" and there had been no "threatening" between them. The injury to decedent was the result of an endeavor by the bartender in the performance of his duties to maintain order in the saloon. The gun was fired intentionally at the bartender and the saloon. It was not a "stray bullet," as referred to by petitioner, or one that was intended for some target not connected with that saloon. The reputation of the saloon, the occurrence of fights therein, and the fact that the bartenders' duties included that of forcibly removing intoxicated customers from the saloon in order to protect the other customers, show that one of the hazards to which an employee was exposed by his employment therein was personal injury resulting from brawls and fights. In the case of *Stevens* v. *Industrial Acc. Com.* (1919), 179 Cal. 592 [178 P. 296], a customer of a cafe engaged in an altercation with a waiter and drew a revolver. Another waiter who approached the scene of the scuffle, apparently for the purpose of assisting in disarming the customer, was killed when the revolver was discharged. The cafe sold intoxicating liquors and catered to persons who were "subject more or less to brawls." It was a part of the duties of the waiter to maintain order. In affirming an award to the widow of the deceased waiter, the court said on page 593: ". . . it needed only to be shown that the hazard was one to which deceased was exposed by his employment to warrant the award. [Citing a case.] On this point the evidence seems crystal clear." In *General Accident, Fire & Life Assur. Corp. Ltd.* v. *Industrial Acc. Com.* (1921), 186 Cal. 653 [200 P. 419], an employee of a garage was struck accidentally by a bullet from a revolver which was fired intentionally by the employer at a man who had gone to the garage to buy gasoline and with whom the employer was having an altercation. The court said at page 656, in affirming an award: "The controversy in which it [the injury] was received arose out of an incident which concerned his [employer's] business . . . that it ultimately resulted in a personal difference, or that the accident was an

340

unusual one, not likely to occur, does not deprive it of its business character. . . ."

In view of the policy of liberal construction of the Workmen's Compensation Act in favor of the employee, a reasonable doubt as to what time an employee commenced his duties as an employee, and as to whether the hazard was one to which an employee was exposed by his employment, should be resolved in favor of the employee. (*California Cas. Ind. Exch.* v. *Industrial Acc. Com.* (1943), 21 Cal.2d 751, 760 [135 P.2d 158].)

"In reviewing the findings of the commission, the courts are without power to disturb them unless there is a lack of substantial evidence." (*Pacific Lbr. Co.* v. *Industrial Acc. Com.* (1943), 22 Cal.2d 410, 422 [139 P.2d 892].)

The award is affirmed.

Shinn, Acting P. J., and Shaw, J. pro tem., concurred.